**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

RAMESES WILLIAMS,

                             Plaintiff,

        v.                                         No. 08-CV-413
                                                   (TJM/DRH)

B. FISCHER, Commissioner, NYS DOCS;
J. TAYLOR, Superintendent, Gouverneur Correctional
Facility; R. PIRIE, Deputy Superintendent of
Programs, Gouverneur Correctional Facility; and
J. NOCERA, Investigator/New York State Inspector
General, NYS DOCS,

                             Defendants.
_____

**APPEARANCES:**                                 **OF COUNSEL:**

RAMESES WILLIAMS
Plaintiff Pro Se
16-00 Hazen Street
East Elmhurst, New York 10035

HON. ANDREW M. CUOMO                 MICHAEL G. McCARTIN, ESQ.
Attorney General for the                     Assistant Attorney General
   State of New York
Attorney for Defendants
The Capitol
Albany, New York 12224-0341

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**

## REPORT-RECOMMENDATION AND ORDER[1]

    Plaintiff pro se Rameses Williams ("Williams"), formerly an inmate in the custody of the

New York State Department of Correctional Services ("DOCS"), brings this action pursuant

to 42 U.S.C. § 1983 alleging that defendants, the DOCS Commissioner and three DOCS

_____

     [1]This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

employees, violated his constitutional rights under the First, Fifth, Eighth, and Fourteenth Amendments. Compl. (Dkt. No. 1).  Presently pending is defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56.  Dkt. No. 47.  Williams' opposes the motion.  Dkt. No. 53.  For the following reasons, it is recommended that defendants' motion be granted.

## I. Background

The facts are related herein in the light most favorable to Williams as the non-moving party.  See subsection II(A) infra.  The events in question occurred during Wiliams' incarceration at Gouverneur Correctional Facility ("GCF").

In early 2008, defendant Taylor, the GCF Superintendent, was informed that the GCF mail room was "receiv[ing] an unusual amount of inmate mail addressed to the Internal Revenue Service [(IRS)]."  Taylor Decl. (Dkt. No. 47-14) ¶ 5.  Taylor was also informed that "a publication was circulating in the prison, entitled The American's Bulletin[2], . . . which advocated the filing of fraudulent tax returns as a form of protest against what the authors'

---

[2] The American's Bulletin, written by Jim Rivers and Obie One Kanobi, explains how "[t]he 'system' in today's world, . . . is now completely dominated/controlled by the forces of darkness, i.e. Satan/Lucifer/Devil," (Dkt. No. 47-5 at 2), that the United States is a private foreign corporation based in England (Id. at 3), that courts and judges have no lawful authority and are merely agents of the foreign corporation (Id.), that states are making thousands of dollars per inmate per day and that appearance bonds are a source of unlimited 'commercial energy" (Id. at 5-6), and that "[i]ndividual income tax is voluntary . . . [and t]hat the IRS has absolutely no legal authority to assess the tax even though they will try to bluff you." (Id. at 7).  The publication goes on to provide inmates with the templates for letters and forms to send to the District Attorney, court, and IRS so that the inmate may "lay[] claim to what is rightfully [theirs by successfully] operating . . . in complete conformance to the letter and intent of the law."  Dkt. No. 47-5 at 7-19.  The reader is first told that, due to the brevity of the publication, it "will make no attempt to prove anything stated herein . . . [and] will of necessity be simply asserted as fact, firmly established as irrefutable . . . ."  Id. at 2.

believe[d] was a 'criminal judicial system.'" <u>Id.</u> ¶ 5; <u>see also</u> Dkt. Nos. 47-5; 47-15.  Taylor

was also aware of a similar situation where inmates at a facility had attempted to file

fraudulent tax returns.  Taylor Decl.  ¶ 6.  Taylor contacted the Inspector General's office for

advice.  Taylor Decl. ¶ 8.  An inspector spoke with Taylor, providing him with

> details of the scheme which included [filing] IRS forms . . . and
> letters to the District Attorneys requesting an IRS filing based on
> the [inmate's] indictment number and social security number.  The
> scheme [wa]s based on false withholding credits attributed to
> 'appearance bonds,' [and] involve[d] the filing of frivolous returns
> and claims using Tax Form 1099-OID, Original Issue Discount
> forms.  The forms and letters [we]re nearly identical to those
> provided as examples in <u>The American's Bulletin</u> publication which
> was circulating GCF at the time.

<u>Id.</u> ¶ 8.

    After speaking with the investigator, Taylor "was concerned that there was an inmate

conspiracy developing at GCF . . . which aspired to defraud the Internal Revenue Service of

funds by filing false or misleading tax returns . . . as advocated in <u>The American's Bulletin</u>,"

so he decided to personally open and review outgoing inmate mail addressed to the IRS to

determine whether a scam was actually occurring at GCF.  Taylor Decl. ¶ 9.  Prior to

initiating any action, Taylor spoke with DOCS counsel, who advised Taylor that based on

the information presented, he "had sufficient reason to open and review the contents of the

envelopes addressed to the IRS."  <u>Id.</u> ¶ 14.  Accordingly, pursuant to DOCS Directive No.

4421[3], Taylor authorized and began inspecting the outgoing mail.  <u>Id.</u> ¶ 14.

---

[3] The DOCS directive provides that:

> the Superintendent shall not authorize the reading of . . .
> outgoing privileged correspondence unless there is a reason to
> believe that the provisions of this or any directive or rule or
> regulation have been violat[ed], that any applicable state or

Taylor's investigation revealed multiple envelopes addressed to the IRS which contained the forms previously identified by the Inspector General's investigator, letters to District Attorneys seeking filings based upon the inmate's indictment and social security numbers, and requests for IRS refunds in excess of several hundred thousand dollars.  Taylor Decl. ¶ 14.  Taylor notified the DOCS Inspector General's office in Albany which initiated a case and investigation.  Id. ¶ 15; see also Nocera Decl. (Dkt. No. 47-24) ¶¶ 8-9.  On January 30, 2008, the Inmate Liaison Committee was also informed of the pending "investigation into a possible inmate IRS tax scam."  Taylor Decl. ¶ 16.

Between January 2008 and June 2009, defendant Nocera, an investigator for the Inspector General's Office, worked with the GCF staff and the IRS's Criminal Investigation Division to investigate Taylor's concerns of tax fraud.  Nocera Decl.  ¶ 11.  During the investigation, Nocera reviewed fourteen different inmate's outgoing mail which all "included documents consistent with the tax scam advocated in The American's Bulletin . . . .[and] sought an IRS refund in excess of several hundreds of thousands of dollars, and in some cases, . . . millions of dollars. " Id. ¶¶ 11-12.  As a result of the investigation, Nocera issued misbehavior reports for false and misleading statements and soliciting, of which "[a]ll [fourteen] inmates were found guilty and were given various sanctions, including time in SHU."  Id. ¶¶ 18-19; see also Taylor Decl. ¶ 17.  Nocera based these misbehavior reports

_____

federal law has been violated, or that the content of such correspondence threatens the safety, security, or good order of a facility or the safety or well being of any person.

Taylor Decl. ¶ 11.  Furthermore, if a violation of any of the above is noted after reading the correspondence, it "may be confiscated, and the inmate provided with written notice of the confiscation, unless doing so would be inconsistent with the need to safeguard an investigation."  Id.  ¶ 12.

4

upon "conversations with IRS Special Agent Kelly Ewald" and the "hallmarks of a fraudulent

tax return . . . ." which included:

> (1) the excessive amount of the tax refund demanded; (2) the lack
> of supporting documentation to substantiate a tax refund demand
> of that amount; (3) the fact that [inmates] had listed a private
> address instead of [the] then current address as an inmate, which
> [Nocera] believed was an attempt to conceal from the IRS the fact
> that the filer was an inmate and therefore unlikely to have income
> or assets sufficient to justify a tax refund of the amount demanded;
> [and] (4) the use of Forms 1099-OID and 1096 to claim large
> withholding credits attributed to appearance bonds posted as a
> result of inmate incarceration.

Nocera Decl. ¶¶ 12-13.

On January 18, 2008, Williams placed an envelope, containing tax return documents,

into the mail at GCF addressed to the IRS. Williams Decl. (Dkt. No. 53-3) ¶ 14. Taylor

discovered these documents in which Williams had attempted to send the IRS a "tax return

claiming that, in 2007, he had $12,500,000 in '[o]ther income,' which he labeled as [an]

'Appearance Bond.'" Taylor Decl. ¶ 19; Nocera Decl. ¶ 14; Dkt. Nos. 47-4 at 14, 47-11 at

16. Additionally, Williams' documents included a Form 1099-OID asserting "that District

Attorney Robert M. Morgenthau withheld a total of $12,500,000 in federal income tax as

'holder in due course' . . . ." Taylor Decl. ¶ 19; Nocera Decl. ¶ 14; Dkt. Nos. 47-4 at 15, 47-

11 at 17;Dkt Nos. 53 at 5-14, 53-3 at 4-11. Lastly, Williams listed his address on the

correspondence as his sister's residence and not his current address at GCF, in a potential

"attempt . . . to conceal from the IRS the fact that he was incarcerated and therefore very

unlikely to have a source of income or assets sufficient to generate a tax refund of the

magnitude he claimed." Taylor Decl. ¶ 20; Nocera Decl. ¶ 15. Williams contends that he

utilized his sister's address on the tax forms because he "believed that it would be a more

5

secure address . . . to receive funds . . . [and] that the Department of Corrections would not intercept what [Williams] believe[d he] was entitled to receive." Williams Dep. (Dkt. No. 47-3) at 18-20, 29-31. On January 25, 2008, when questioned by Nocera, Williams indicated that he filed the return to "try it, because if it worked [he] would get the money." Nocera Decl. ¶ 14; but see Williams Dep. (Dkt. No. 47-3) at 31-31 (stating that Nocera paraphrased Williams' responses).

On January 24, 2008, Williams filed a grievance complaining that his mail to the IRS was opened, read, and confiscated. Dkt. No. 47-9 at 3, 6. On January 30, 2008, Williams received a letter informing him that his tax returns had been confiscated pursuant to directive 4421, "as the subject of a joint investigation between [DOCS] . . . and the [IRS] relating to a possible violation of Federal Law." Taylor Decl. ¶ 21; Dkt. No. 47-11 at 13. Also on January 30, the Inmate Liaison Committee was advised by defendant Pirie, a GCF Deputy Superintendent, and Taylor were in attendance and Taylor informed the committee "of the wide-spread investigation being conducted by the I[nspector] G[eneral]'s Office into the IRS scam." Dkt. Nos. 53 at 16, 53-3 at 17.

On February 1, 2008, Williams was issued a misbehavior report charging him with false and misleading statements and soliciting. Taylor Decl. ¶ 22; Nocera Decl. ¶ 17; Dkt. Nos. 47-4 at 9; 47-11 at 11; 47-26 at 1. Williams' grievance was denied on February 5, 2008 by the IGRC,[4] referring to the letter written on January 30th for its reasoning. Dkt. No. 47-9 at

---

[4]"The IGP [Inmate Grievance Program] is a three-step process that requires an inmate to: (1) file a grievance with the IGRC [Inmate Grievance Resolution Committee]; (2) appeal to the superintendent within four working days of receiving the IGRC's written response, and (3) appeal to the CORC [Central Office Review Committee] ... within four working days of receipt of the superintendent's written response." Abney v. McGinnis, 380 F.3d 663, 668 (2d Cir.2004) (internal citations omitted).

3, 7.  The IGRC's finding was affirmed by the Superintendent on February 12, stating that

the "mail was confiscated as part of a joint investigation . . . relating to a violation of Federal

Law."  Dkt. No. 47-9 at 3, 4; see also Dkt. No. 47-9 at 8.  Williams again appealed the

disposition, which was again denied by CORC.  Dkt. No. 47-9 at 1, 3.

On February 11 and 14, 2008, Williams attended a Tier III hearing on the charges.[5]

Taylor Decl.  ¶ 23; Nocera Decl. ¶ 18; see also Dkt. Nos. 47-4 at 6-17, 47-11 at 8-19; 47-22

at 14 (identical copies of hearing packets, or portions thereof); Dkt. Nos. 47-6, 47-21

(transcript of the hearing).  Pirie presided over the hearing and received testimony from

Nocera.  Taylor Decl. ¶ 23; Pirie Decl. (Dkt. o. 47-27) ¶ 4.  During the hearing, Pirie (1)

reviewed the documents Williams submitted to the IRS claiming $12,500,000 in other

income from the appearance bond and letters submitted to the District Attorney contending

he was a holder in due course for the twelve million dollars; (2) heard testimony from

Nocera about the joint investigation and information gathered from the IRS that "filing of tax

refunds based on appearance bonds, of the same type that [Williams] attempted to file . . . ,

was a common tax scam that the IRS was aware of and investigating;" and (3) heard

testimony from Williams about his "belie[f] that he had received legitimate advi[c]e [from]

The American's Bulletin which allowed him to seek perhaps millions or tens of thousands of

dollars in a tax refund from the IRS."  Pirie Decl. ¶¶ 5-6; see also Williams Dep. at 23-31, 35

(explaining that Williams believed tax advice from author Obie One Kanobi because (1) his

article was not banned in the prison and (2) people use different names in life; therefore,

---

[5]DOCS regulations provide for three tiers of disciplinary hearings depending on the
seriousness of the misconduct charged.  A Tier III hearing, or superintendent's    hearing,
is required whenever disciplinary penalties exceeding thirty days may be imposed.  N.Y.
Comp. Codes R. & Regs. tit. 7, §§ 253.7(iii), 270.3(a) .

since the publication was not banned and stated it was based in law, Williams believed that he was entitled to some money, though he was unsure as to exactly how much).[6]

Pirie found Williams guilty, relying upon the tax forms, information from the IRS, Wiliams' concealment of his address at GCF, and the "entirely preposterous [idea] that the plaintiff would be entitled to the magnitude of the tax refund that he sought from the IRS," and sentenced to eight months in the Special Housing Unit ("SHU")[7] and eight months loss of good time.  Pirie Decl. ¶¶ 7-8; see also Taylor Decl. ¶ 23; Nocera Decl. ¶ 18.  At the conclusion of the hearing, Williams failed to object to the way Pirie had presided over it, instead remarking that he "th[ought Pirie] did an excellent job [in] conducting th[e] hearing." Pirie Decl. ¶ 9; see also Williams Dep. at 63-68 (explaining that Pirie did not demonstrate unfairness or bias during the actual hearing, did not abuse his authority, and genuinely conducted a good hearing); Dkt. No. 47-6 at 16 (hearing transcript whereupon Wiliams stated that he thought Pirie "did an excellent job conducting this hearing . . . .").  Williams appealed the hearing and had the disciplinary dispositions administratively reduced to four months in SHU and two months loss of good time credits, but the findings of guilt were both administratively upheld.  Pirie Decl. ¶ 8; see also Dkt. Nos. 47-4 at 2-3; 47-28 at 1-2.

Following the hearings, on February 21, 2008, Williams wrote to the DOCS

---

[6] However, during later testimony, Williams indicated that he was aware that another inmate's tax return, filed in the same manner as those submitted by Williams, resulted in the check being confiscated by DOCS, sent back to the IRS, and the inmate suffering disciplinary sanctions.  Williams Dep. at 43-46.

[7] SHUs exist in all maximum and certain medium security facilities.  The units "consist of single-occupancy cells grouped so as to provide separation from the general population . . . ."  N.Y. Comp. Codes R. & Regs. tit. 7, § 300.2(b).  Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required.  Id. at pt. 301.

Commissioner regarding the disciplinary disposition for which he contends he was falsely convicted.  Dkt. No. 53 at 24.  On March 15, 2008, Williams submitted another grievance seeking to discover what piece of mail was confiscated.  Dkt. No. 47-10 at 3, 5.  Wiliams' grievance was denied, directing him to the memorandum and receipt that he had previously received stating that his IRS forms had been withheld.  Dkt. No. 47-10 at 3, 4, 6.  Williams again appealed the disposition, but the denial was upheld by CORC on May 21, 2008, for those reasons previously stated.  Dkt. No. 47-10 at 1, 3.

   In 2009 after being released from prison, Williams again attempted to receive a tax return based upon his appearance bond and The American's Bulletin.  Williams Dep. at 76. In response, the IRS indicated that the tax forms which Williams submitted in 2008 were incorrect and that any further filings would result in a $5,000 fine from the IRS.  Id. at 77; Dkt. Nos. 53 at 18-19, 53-3 at 19-20 (letter dated June 5, 2009).[8]  Despite the letter, Williams still asserted an entitlement to a return from the IRS during his deposition but believed the return now only totaled a few hundred thousand dollars, instead of a multi-million dollar return, and expressed a need to consult with a tax attorney prior to making additional filings.  Williams Dep. at 78, 81, 89-90.  Williams submitted additional tax forms, and letters to the District Attorney, for the year 2008 for a $500,000 appearance bond.  Dkt. No. 59 at 5-10.  Williams again received a letter from the IRS, similar to the one he previously received on June 5, 2009, indicating that the documents did not qualify as legitimate claims, "ha[d] no basis in law and represent[ed] a frivolous position."  Dkt. No. 59

---

[8] In Williams' submissions, there was an additional letter from the IRS dated April 1, 2008 which specifically and unequivocally stated that any appearance bond taken out in his name "has **no value** to [Williams.]" Dkt. No. 53-3 at 39.

(letter dated January 25, 2010).  The correspondence again threatened a $5,000 fine for

any additional fraudulent claims which were filed.  Later submissions to the court indicate

that Williams ceased pursuing these filings shortly thereafter, requesting that the IRS to

"rescind and . . . withdraw the filing[s of his tax forms] . . . ."  Id. at 2.


## II.  Discussion

Williams contends that his First Amendment rights were violated when defendants

opened and confiscated his outgoing mail and that he was retaliated against for filing

grievances.  Williams asserts that his Fifth Amendment rights were violated during his

disciplinary hearing.[9]  Additionally, Williams alleges that the time which he spent in SHU

was harsh and excessive in violation of his Eighth Amendment rights.  Last, Williams states

that his Fourteenth Amendment rights were violated because (1) he was subjected to a

biased hearing officer, (2) the disciplinary disposition removed him from a program which

would have made him eligible for an earlier parole date, and (3) the prison regulations

under which he was disciplined were vague.  Defendants assert that Williams has failed to

state a constitutional claim, his claims are without merit, Fischer must be dismissed for a

lack of personal involvement, and defendants are entitled to qualified immunity.

---

[9] Williams also alleges violations occurring under the Fifth Amendment, but the Fifth
Amendment is inapplicable. The Fifth Amendment pertains to criminal charges and
prohibits the federal government from violating a person's due process rights. See Public
Utilities Comm'n v. Pollak, 343 U.S. 451, 461 (1952); Am. Bankers Mortgage v. Fed.
Home Loan Mortgage, 75 F.3d 1401, 1406 (9th Cir. 1996); Birdsall v. City of Hartford, 249
F. Supp. 2d 163, 170 (D. Conn. 2003).  As this case is civil and not criminal in nature and
asserts no conduct by any federal employee, official, or entity, the Fifth Amendment does
not apply.

**A. Legal Standard**

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed. R. Civ. P. 56; <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  Facts are material if they may affect the outcome of the case as determined by substantive law.  <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 248 (1986).  All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. <u>Skubel v. Fuoroli</u>, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).  It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. <u>Gallo v. Prudential Residential Servs.</u> 22 F.3d 1219, 1223-24 (2d Cir. 1994); <u>Graham v. Lewinski</u>, 848 F.2d 342, 344 (2d Cir. 1988).

When, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude.  <u>See</u> <u>Triestman v. Fed. Bureau of Prisons</u>, 470 F.3d 471, 477 (2d Cir. 2006).  As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant
> is entitled to "special solicitude," that a pro se litigant's submissions
> must be construed "liberally," and that such submissions must be
> read to raise the strongest arguments that they suggest.  At the
> same time, our cases have also indicated that we cannot read into

11

> pro se submissions claims that are not "consistent" with the pro se
> litigant's allegations or arguments that the submissions themselves
> do not "suggest," that we should not "excuse frivolous or vexatious
> filings by pro se litigants" and that pro se status "does not exempt a
> party from compliance with relevant rules of procedural and
> substantive law.

Id. (internal citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant # 1, 537 F. 3d 185, 191-92 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds pro se, . . . a court is obliged to construe his pleadings liberally." (citations omitted)).

### B. Personal Involvement

Defendants seeks dismissal of defendant Fischer based on a lack of personal involvement. Personal involvement is an essential prerequisite for section 1983 liability.  Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994).  A section 1983 defendant, however, cannot be liable "merely because he held a high position of authority."  Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996).  However, supervisory personnel may be considered " personally involved" if:

> 1) the defendant participated directly in the alleged
> constitutional violation;
>
> 2) the defendant, after being informed of the violation through
> a report or appeal, failed to remedy the wrong;
>
> 3) the defendant created a policy or custom under which
> unconstitutional practices occurred, or allowed the
> continuance of such a policy or custom;
>
> 4) the defendant was grossly negligent in supervising
> subordinates who committed the wrongful acts; or

> 5) the defendant exhibited deliberate indifference to the rights
> of inmates by failing to act on information that
> unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986)).

Williams contends nonetheless that because of Fischer's authority within DOCS and the fact that he had given Fischer notice of his claims, he is liable.  Fischer cannot be held liable simply because he is a supervisor.  Black, 76 F.3d at 74.  Williams does not contend that Fischer directly participated in any of his alleged constitutional violations.  However, Williams does contend that because he sent him a letter, Fischer was personally involved.  Dkt. No. 53 at 24.  Such contentions are meritless. See Bodie v. Morgenthau, 342 F. Supp. 2d 193, 203 (S.D.N.Y. 2004) (citations omitted) (finding personal involvement only where a supervisory official received, reviewed, and responded to a prisoner's complaint); Johnson v. Wright, 234 F. Supp. 2d 352, 363 (S.D.N.Y. 2002) ("[I]f mere receipt of a letter or similar complaint were enough, without more, to constitute personal involvement, it would result in liability merely for being a supervisor, which is contrary to the black-letter law that § 1983 does not impose respondeat superior liability.") (citations omitted).  Similarly, receipt of a letter, without personally investigating or acting on the letter or grievance, is insufficient to establish personal involvement.  See, e.g., Rivera v. Fischer, 655 F. Supp. 2d 235, 238 (W.D.N.Y. 2009) (citing cases); Boddie v. Morgenthau, 342 F. Supp. 2d 193,  203 (S.D.N.Y. 2004).  Moreover, the complaint fails to allege facts sufficient to presume that Fischer failed to train any of the defendants or that he was grossly negligent.

13

Therefore, because Williams failed to show that Fischer had any personal involvement in the matters alleged in the complaint, the motion to dismiss should be granted on this ground as to Fischer.

### C. First Amendment[10]

### 1. Retaliation

Liberally construing Williams' complaint, he also alleges that he was issued his misbehavior report in retaliation for filing a grievance seeking the return of his confiscated documents.  To state an actionable claim for retaliation, a plaintiff must first allege that the plaintiff's conduct was constitutionally protected and that this protected conduct was a substantial factor that caused the adverse action against plaintiff.  Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996); see also Lipton v. County of Orange, 315 F. Supp. 2d 434, 447-48 (S.D.N.Y. 2004) (applying First

---

[10] Williams' initial actions in attempting to file a false tax form and collect money which was not rightfully his were neither constitutional nor protected.  See e.g., United States v. Rowlee, 899 F.2d 1275, 1279 (2d Cir. 1990) ("The consensus of this and every other circuit is that liability for a false or fraudulent tax return cannot be avoided by evoking the First Amendment.") (citing cases).  Even construing the facts in the light most favorable to Williams, his purported defense of ignorance is belied by the fact that he had notice that these actions were punishable by DOCS, he attempted to deceive the IRS by failing to disclose that he was in prison, he stated to Nocera that he was intending to see what was available to him yet recognized that he had never acquired anywhere near twelve million dollars in income, and he received information from the IRS that the attempted filings were fraudulent and he still continued to submit claims.  Therefore, Williams' actions and attempt at further perpetuating the lawlessness advocated by The American's Bulletin are not actionable under § 1983.  See United State v. Shugarman, 596 F. Supp. 186, 190 (D.C.Va 1984) ("It is settled . . . that the first amendment protects an individual's right to disagree with the law . . . [but t]here is no protection . . . for speech or advocacy that is directed toward producing imminent lawless action.") (citing Brandenburg v. Ohio, 395 U.S. 444 (1969)).

14

Amendment retaliation factors to a pretrial detainee complaint).  Courts must view retaliation claims with care and skepticism to avoid judicial intrusion into matters of prison administration.  Jackson v. Onondaga County, 549 F. Supp. 2d 204, 214-15 (N.D.N.Y. 2008).  Conclusory allegations alone are insufficient.  Id. at 214 (citing Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 1983) (explaining that "claim[s] supported by specific and detailed factual allegations . . . ought usually be pursued with full discovery.")).

    In this case, Williams has failed to allege facts sufficient to support a retaliation claim.  While filing grievances and lawsuits are actions protected by the First Amendment, Williams has failed to establish that his misbehavior report was false or filed as a result of his grievance.  First, Williams admits to filing the forms and letters to the IRS, forms and letters which he has been told by the IRS were fraudulent and form the basis of disciplinary action.  Williams Dep. at 76-90; Dkt. No. 53 at 18-19; Dkt. No. 53-3 at 19-20, 39; Dkt. No. 59 at 2, 5-10 Thus, based upon his own admission and subsequent information from the IRS, the misbehavior reports lodged against Williams were not false as he was attempting unlawfully to solicit money from the IRS based upon false information.  Second, Williams' claims are conclusory and unsupported.  Accordingly, they must be dismissed.  Jackson, 713 at 214.

     Accordingly, defendants' motion should be granted as to these claims.

## 2. Mail Tampering[11]

"A prisoner's right to the free flow of incoming and outgoing mail is protected by the

First Amendment." Davis v. Goord, 320 F.3d 346, 351 (2d Cir. 2003) (citations

omitted).  "A prisoner's right to receive and send mail, however, may be regulated."

Johnson v. Goord, 445 F.3d 532, 534 (2d Cir. 2006) (citations omitted).  While legal

mail is afforded the greatest protection, "greater protection [is afforded] to outgoing

mail than to incoming mail." Davis, 320 F.3d at 351 (citations omitted).

The Second Circuit has determined two different tests by which to evaluate

whether infringements on inmate correspondence were constitutionally justified.

Compare Davis, 320 F.3d at 351 ("Restrictions . . . are justified only if they further one

or more of the substantial governmental interests of security, order, and rehabilitation

and must be no greater than is necessary or essential to the protection of the

particular government interest involved.") with Johnson, 445 F.3d at 534-35 (applying

the Turner test to prisoner's challenge on regulating mail which asks whether (1) there

is "a valid, rational connection between the prison regulation and the legitimate

government interest . . . [(2)] whether there are alternate means of exercising the right

[for inmates; (3)] . . . the impact accommodation of the right . . . will have on [DOCS;

and (4)] . . . proposed alternatives.") (internal quotation marks and citations omitted).

---

[11] To the extent that, liberally reading Williams' complaint, the confiscation of Williams' IRS forms pursuant to the mail watch could be deemed a Fourth Amendment violation, such contentions are also without merit.  See United States v. Felipe, 148 F.3d 101, 108 (2d Cir. 1998) ("[T]he interception of a defendant's prison correspondence does not violate that individuals First or Fourth Amendment rights if prison officials had a good or reasonable cause to inspect the mail.") (internal quotation marks and citations omitted). For the same reasons cited infra, the defendants' motion is granted on this ground.

16

Regardless of which test is applied, defendants' conduct satisfies either standard. With regard to the Davis standard, defendants actions in confiscating and inspecting the envelopes addressed to the IRS furthered a substantial government interest because defendants determined, based upon a lengthy investigation and previous experience with inmate tax schemes, that The American's Bulletin was inciting similar conduct at GCF.  Such actions are contrary to governmental aims of security, order, and rehabilitation because allowing the continuance of a tax scam would incite the inmates against the government, potentially cheat the government out of millions of dollars, and continue to encourage and support illegal actions.  The mail watch was instituted only for a specific segment of outgoing mail which was reasonably believed to be perpetuating the fraud and, therefore, the restriction was not greater than necessary to conduct a thorough investigation.

Moreover, under to the Turner standard, the Second Circuit has already determined that facility instituted mail watches are constitutional as a reasonable measure "to ensure the good order of the prison and the rehabilitation of prisoners by preventing a prisoner from engaging in illegal activities while incarcerated."  Duamutef v. Hollins, 297 F.3d 108, 112-13 (2d Cir. 2002) (internal quotation marks and citations omitted).  Such inspection of the outgoing mail was undertaken to prevent illegal activity.  Thus, the mail watch was consistent with legitimate penological goals and satisfied the Turner standard.

Accordingly, defendants' motion should be granted on this ground.

### D.  Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment."  U.S. Const. amend. VIII.  "The Constitution does not mandate comfortable prisons but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."  Farmer, 511 U.S. at 832. As with other Eighth Amendment claims, a "plaintiff must satisfy both an objective . . . and subjective test."  Jolly, 76 F.3d at 480 (citations omitted).

Williams contends that his placement in SHU was, in itself, cruel and unusual punishment.  However, this claim is without merit.  See, e.g., Dixon v. Goord, 224 F. Supp. 2d 739, 748 (S.D.N.Y. 2002) ("The conditions of special housing units do not per se constitute cruel and unusual punishment in violation of the Eighth Amendment.") (citations omitted).  Williams failed to proffer any evidence that his confinement in SHU was abnormal.  Williams testified that he received all his meals, his recreation time, access to showers, and delivery of his mail.  Williams Dep. at 70-74.  Therefore, Williams has failed to establish a basis for Eighth Amendment relief.

Accordingly, defendants' motion should be granted on this ground.

### E. Fourteenth Amendment

Williams claims that his Fourteenth Amendment rights have been violated because his hearing officer was biased, his confinement interfered with a program which may have resulted in earlier parole, and he was convicted based upon vague prison

18

regulations.

## 1. Due Process[12]

As a threshold matter, an inmate asserting a violation of his or her right to due process must establish the existence of a protected interest in life, liberty, or property. See Perry v. McDonald, 280 F.3d 159, 173 (2d Cir. 2001). To establish a protected liberty interest, a prisoner must satisfy the standard set forth in Sandin v. Conner, 515 U.S. 472, 483-84 (1995). This standard requires a prisoner to establish that the deprivation was atypical and significant in relation to ordinary prison life. Id. at 484; Jenkins v. Haubert, 179 F.3d 19, 28 (2d Cir.1999); Frazier v. Coughlin, 81 F.3d 313, 317 (2d Cir.1996). The fact that an inmate has been disciplined with a segregated confinement alone is insufficient to establish an atypical and significant deprivation. The Second Circuit has articulated a two-part test whereby the length of time a prisoner was placed in segregation as well as "the conditions of the prisoner's

---

[12] While not argued by defendants, it is important to note that Williams' due process claims are also precluded from review.  Williams alleges due process violations in connection with his disciplinary proceeding.  However, such claims run afoul of the "favorable termination" rule of Heck v. Humphrey, 512 U.S. 477, 487-87 (1994).  That rule provides that if a determination favorable to the plaintiff in a § 1983 action "would necessarily imply the invalidity of his conviction or sentence," a plaintiff must prove that the conviction or sentence has been reversed on direct appeal or declared invalid in order to recover damages under § 1983.  This rule applies to challenges to procedures used in prison disciplinary proceedings.  Edwards. v. Balisok, 520 U.S. 641 (1997).  There is no evidence that Williams' disciplinary determinations were ever vacated.  While Williams' sentence was modified, it was never overturned or expunged.  Thus, the Heck rule still applies and any procedural challenges are barred.  Therefore, because Williams' recovery of damages here for a false misbehavior report and his requested relief to amend his disciplinary history would necessarily imply the invalidity of his disciplinary conviction, the requested relief based on that hearing is barred.

segregated confinement relative to the conditions of the general prison population" are

to be considered.  Vasquez v. Coughlin, 2 F. Supp. 2d 255, 259 (N.D.N.Y.1998).  The

Second Circuit has noted that where the period of segregated confinement exceeds

thirty days, "refined fact-finding" is required to resolve defendants' claims under

Sandin.  Colon v. Howard, 215 F.3d 227, 230 (2d Cir. 2000).

     As Williams spent more than thirty days in keeplock, questions of fact exist as to

the liberty interest asserted by him.  Accordingly, defendants' motion on this ground

should be denied.


## 2. Fair and Impartial Hearing

     While inmates are not given "the full panoply of [due process] rights," they are still

afforded procedural process.  Wolff v. McDonnell, 418 U.S. 539, 556 (1974).

Prisoners are "entitled to advance written notice . . . ; a hearing affording him a

reasonable opportunity to call witnesses and present documentary evidence; a fair and

impartial hearing officer; and a written statement of the disposition including the

evidence relied upon and the reasons for the disciplinary actions taken."  Sira v.

Morton, 380 F.3d 57, 69 (2d Cir. 2004) (citations omitted).  The only aspect of

Williams' hearing for which he proffered a complaint was about the actions of

defendant Pirie as his hearing officer.

     Prisoners have a constitutional right to a fair and impartial hearing officer.  See,

e.g., Sira v. Morton, 380 F.3d 57, 69 (2d Cir. 2004).  However, "[t]he degree of

impartiality required of prison officials does not rise to the level of that required of

judges . . .  [as i]t is well recognized that prison disciplinary hearing officers are not

20

held to the same standard of neutrality as adjudicators in other contexts." <u>Allen v.</u>
<u>Cuomo</u>, 100 F.3d 253, 259 (2d Cir. 1996) (citations omitted).   The Supreme Court

held "that the requirements of due process are satisfied if some evidence supports the

decision by the [hearing officer] . . " and the Second Circuit has held that the test is

whether there was "'reliable evidence' of the inmate's guilt." <u>Luna v. Pico</u>, 356 F.3d

481, 487-88 (2d Cir. 2004); <u>see also</u> <u>Superintendent, Mass. Corr. Inst. v. Hill</u>, 472 U.S.

445, 455 (1985).

   In this case, it is clear that Williams' disposition was based on ample evidence and

that, even viewing the evidence in the light most favorable to him, Pirie was not biased.

First, Williams' claims of impartiality are belied by his testimony both during the

disciplinary hearing and at his deposition that Pirie did a very good job conducting the

hearing and he took no issue with the procedures that had been undertaken.  Williams

Dep. at 63-68; Dkt. No. 47-6 at 16.  Second, there is nothing in the record to indicate

that Pirie had predetermined Williams' disposition as the tax scheme that was

discussed at the prior ILC meeting was only addressed as a potential scheme.  Dkt.

Nos. 53 at 16, 53-3 at 17.  The meeting's minutes only expressed the fact that the

potential scheme was being investigated; however, that was a not an affirmative

representation that the scheme was actually a scheme or that Williams had

participated in it.  Accordingly, Pirie's attendance at the meeting did not render him

jaded.

   Finally, Pirie stated an abundance of information upon which it is reasonable to

believe that Williams was guilty of both soliciting and making false statements.  It is

undisputed that the "tax advice" proffered in <u>The American's Bulletin</u> came from a

fanciful character, Williams used an address other than his current one when filling out the tax forms, the forms used and the manner in which they were filled out corresponded to previous tax fraud schemes, and Williams was unsure of the financial information he had included in the forms.  All of this is sufficient to establish reliable evidence supporting both charges.

Accordingly, defendants' motion should be granted on this ground.


### 3. Vague Prison Regulations

"Courts have recognized prisoners' substantive due process claims that allege that prison rules failed to provide adequate notice of prohibited conduct.  The underlying rationale . . . [is that] inmates must be free to avoid prohibited conduct, and prison regulations must therefore place them on notice . . . ."  Leitzsey v. Coombe, 998 F. Supp. 282, 289 (W.D.N.Y. 1998).

> A statute is unconstitutionally vague if persons of common intelligence must necessarily guess at its meaning and differ as to its application, or if it fails to give a person of ordinary intelligence fair notice of conduct proscribed or required by the regulation and encourages arbitrary and erratic behavior on the part of the officials charged with enforcing the rule.

Giano v. Senkowski, 54 F.3d 1050, 1057 (2d Cir. 1995) (internal quotation marks and citations omitted).

In this case, the prison regulations prohibiting solicitation and filing false statements are neither vague nor open to multiple interpretations.  With regard to Williams' correspondence, the regulations need not have addressed the specifics of filing taxes. All that is required is for inmates to be truthful in their daily living, whether through

actions, oral representations, or written filings.  Using false identifying information and financial figures which were not reasonably believable or verifiable are both obvious transgressions of the previously mentioned facility rules.  Moreover, giving credence to testimony that an individual, heeding tax advice from Obi One Kanobi, who makes multiple declarations on the invalidity of the government and the lack of jurisdiction of the courts, "is so replete with . . . improbabilities that a reasonable jury could not find that [a constitutional violation occurred] . . . ."  Jeffreys v. Rossi, 275 F. Supp. 2d 463, 475 (S.D.N.Y. 2003) (dismissing excessive force claim because the inmate's story was full of "inconsistencies and improbabilities" . . . . ").

Furthermore, even if it could be said that such regulations were vague, Williams testified that he was fully aware that filing such forms and acting in such a manner had previously resulted in inmate discipline.  Williams Dep. 43-46.  Therefore, it was clear to him that engaging in such activity was prohibited conduct which would result in disciplinary actions.  Thus, the underlying reasoning for such constitutional challenges has also not been offended.

Accordingly, defendants' motion should be granted on this ground.


### E. Parole Eligibility

Williams contends that his time in SHU precluded him from an earlier parole date because it prohibited his participation in a necessary class.  It is undisputed that inmates have no constitutionally protected interest in parole, or other conditional release from prison, prior to the expiration of a valid sentence.  Greenholtz v. Inmates of Neb. Penal and Corr. Complex, 442 U.S. 1, 7 (1979).  The Second Circuit has also

held that inmates have no constitutionally protected liberty interest in internal

classifications or eligibility for rehabilitative programs.  See Pugliese v. Nelson, 617

F.2d 916, 923 (2d Cir. 1980).

Additionally, the Second Circuit has concluded that inmates have "no constitutional

right to discretionary good time release, or to participation in prison programs which

expedite release.  Fifield v. Eaton, 669 F. Supp. 2d 294, 297 (W.D.N.Y. 2009)

(citations omitted); see also Abed v. Armstrong, 209 F.3d 63, 66-67 (2d Cir. 2000)

("Although inmates have a liberty interest in good time credits they have already

earned, no such interest has been recognized in the opportunity to earn good time

credit where, as here prison officials have discretion to determine whether an inmate .

. . is eligible to earn good time credit."); N.Y. Correct. Law § 803(a) (explaining that

inmates may receive credit to reduce their sentence for "good behavior and efficient

and willing performance . . . in an assigned treatment program [but] may [also have

such credits] be withheld, forfeited or canceled in whole or in part for . . . failure to

perform properly in the . . . program assigned.").  Thus, to the extent the complaint

seeks compensation for Williams' presumed inability to accumulate good time credits

after his removal from programming due to his disciplinary disposition, such allegations

are insufficient to survive summary judgment.  Fifield, 669 F. Supp. 2d at 297

("Accordingly, plaintiff's due process claim relating to lost opportunities to earn good

time credits must be dismissed.").

Therefore, defendants' motion should be granted on this ground.

24

**F. Qualified Immunity**

Defendants claim that even if Williams' constitutional claims are substantiated, they are entitled to qualified immunity.  Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Aiken v. Nixon, 236 F. Supp. 2d 211, 229-30 (N.D.N.Y. 2002) (McAvoy, J.), aff'd, 80 Fed.Appx. 146 (2d Cir. Nov. 10, 2003). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified . . . immunity might still be available . . . if it was objectively reasonable for the public official to believe that his acts did not violate those rights." Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991); Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990) (internal citations omitted)).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation.  Saucier v. Katz, 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. Aiken, 236 F. Supp. 2d at 230.  Here, the second prong of the inquiry need not be reached because, as discussed supra, it has not been shown that defendants violated Williams' constitutional rights.  Accordingly, defendants' motion should be granted in the alternative on this ground.

25

### III.  Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants'

motion for summary judgment (Dkt. No. 47) be **GRANTED** and that judgment be

entered in favor of all defendants on all claims.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the

foregoing report.  Such objections shall be filed with the Clerk of the Court "within

fourteen (14) days after being served with a copy of the . . . recommendation."

N.Y.N.D.L.R. 72.1(c) (citing 28 U.S.C. §636(b)(1)(B)-(C)).  **FAILURE TO OBJECT TO**

**THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE**

**REVIEW.**  Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS,

892 F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).


Dated: August 17, 2010
       Albany, New York          _David R. Homer_

                                 United States Magistrate Judge

26